# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **BRIAN E. BRECKENRIDGE,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No. 15-CV-0016-GKF-JFJ** |
| ) | |
| **JIMMY MARTIN, Warden,**[1] ) | |
| ) | |
| **Respondent.** ) | |

## OPINION AND ORDER

Petitioner Brian Breckenridge, a state inmate appearing pro se, brings this 28 U.S.C. § 2254

petition for writ of habeas corpus (Dkt. 3) to challenge the judgments and sentences entered against

him following a jury trial in Tulsa County District Court Case No. CF-2010-3882. Respondent filed

a response (Dkt. 11), and provided the state court records necessary to adjudicate Petitioner's claims

(Dkts. 11, 12, 13). Petitioner did not file a reply. For the reasons discussed below, the Court finds

and concludes the petition for writ of habeas corpus should be denied.

## BACKGROUND

On October 2, 2010, Bobby Lewis and Vincent Lieb kicked in the front door of Larry Ryan's

Tulsa home, held him at gunpoint, demanded money, and threatened to kill him. Dkt. 12-4, Tr. vol.

2, at 133-42, 164; Dkt. 12-5, Tr. vol. 3, at 160-62, 168-70. Ryan fought back. Dkt. 12-5 at 170-71.

As Ryan struggled with Lewis for control of Lewis's gun, Lieb pistol-whipped Ryan in the back of

---

[1]     The Oklahoma Department of Corrections website reflects that Petitioner is currently
incarcerated at North Fork Correctional Center (NFCC). *See* https://okoffender.doc.ok.gov,
last visited March 16, 2018. Jimmy Martin, NFCC's warden, is therefore substituted in place
of Tracy McCollum as party respondent. *See* Rule 2(a), *Rules Governing Section 2254 Cases
in the United States District Courts*. The Clerk of Court shall note this substitution and
Petitioner's current place of incarceration on the record.

the head. Dkt. 12-4 at 141-42. Ryan pushed both men out the front door, and all three men ended up in Ryan's front yard. Dkt. 12-4 at 140-42; Dkt. 12-5 at 169-70. Ryan held Lewis down in the driveway, pulled the trigger of Lewis's gun, and shot Lewis's finger. Dkt. 12-4 at 140-42; Dkt. 12-5 at 209-10, 231. Lieb ran away. Dkt. 12-5 at 170. About a minute later, Ryan saw a white four-door car pull up over the curb and across the end of his driveway. Dkt. 12-4 at 145-147. A young black man with a gun got out of the front passenger side of the car and ran toward Ryan. *Id.* Ryan shot at the young man twice, and he ran back to the car. *Id.* at 146. Ryan then "looked at" the driver of the car and "started to shoot him." *Id.* at 146-47, 162-63. The young man got into the car, and he and the driver drove away. *Id.* at 146. Several of Ryan's neighbors heard the commotion, two neighbors saw a white car drive off, and one neighbor called the police. *Id.* at 195-97, 207-10. Ryan held Lewis down at gunpoint until the police arrived. *Id.* at 153.

Following an investigation, the State of Oklahoma charged Petitioner, Vincent Lieb, and Bobby Lewis in the District Court of Tulsa County, Case No. CF-2010-3882, with attempted robbery with a firearm (Count 1), first degree burglary (Count 2), and assault and battery with a dangerous weapon (Count 3).[2] Dkt. 12-10, O.R. vol. 1, at 42-43.[3] The State further alleged that Petitioner had three former felony convictions. *Id.* at 45.

On November 22, 2010, Lewis pleaded guilty to Counts 1, 2, and 3, and the trial court imposed three concurrent 15-year prison sentences. Dkt. 12-10 at 78-95. That same day, Lieb and Ryan testified at Petitioner's preliminary hearing. Dkt. 12-1, Tr. P. Hr'g (Nov. 22, 2010), at 2. After

---

[2]      In Count 4, the State charged Lewis with knowingly concealing or receiving stolen property. Dkt. 12-10 at 43.

[3]      For clarity, the record cites refer to the CM/ECF header page number in the upper right-hand corner of each document.

the hearing, the State filed an amended information to add a charge against Petitioner for possession of a firearm after former conviction of a felony (Count 5). Dkt. 12-10 at 117-18.

Petitioner's case proceeded to a five-day, three-phase jury trial in May 2012. *See* Dkt. 12-3, Tr. vol. 1; Dkt. 12-7, Tr. vol. 5, at 2. At the conclusion of the first phase, the jury found Petitioner guilty as to Counts 1, 2, and 3. Dkt. 12-7 at 73. During the second phase, the jury considered evidence presented during the first phase as well as evidence that Petitioner had been convicted of a felony in 1993. *Id.* at 85-87. At the conclusion of the second phase, the jury found Petitioner guilty as to Count 5. *Id.* at 93. Finally, during the third phase, the State introduced evidence that Petitioner had two additional previous felony convictions for offenses he committed in 2005. *Id.* at 104-05. At the conclusion of the third phase, the jury found Petitioner committed Counts 1, 2, 3, and 5 after former conviction of two or more felonies and recommended a life sentence and $10,000 fine for each of his four convictions. *Id.* at 127-28.

On June 4, 2012, the trial court adopted the jury's recommendations, sentenced Petitioner to life imprisonment and imposed a $10,000 fine for each conviction, and ordered the life sentences to be served consecutively to each other and consecutively to Petitioner's sentence in Case No. CF-2010-3793. Dkt. 12-9, Tr. Sent. Hr'g (June 4, 2012), at 6. That same day, Lieb pleaded guilty to Counts 1, 2, and 3, and the trial court imposed concurrent prison terms of 25 years on Count 1, 10 years on Count 2, and seven years on Count 3. Dkt. 12-11, O.R. vol. 2, at 67-83.

Petitioner filed a direct appeal with the Oklahoma Court of Criminal Appeals (OCCA), asserting 12 propositions of error. Dkt. 11-1, Pet'r App. Brief, at 2-3. By unpublished summary opinion filed October 3, 2013, the OCCA affirmed Petitioner's convictions and sentences. Dkt. 11-

3, *Breckenridge v. State*, No. F-2012-544, (Okla. Crim. App. 2013) (unpublished) (hereafter, "OCCA Op."), at 10.

On November 19, 2013, Petitioner filed an application for post-conviction relief in state district court, asserting 10 propositions of error. Dkt. 11-4, Pet'r. PC Brief, at 9. He later filed a "supplemental" application asserting three propositions of error. *Id.* at 23. The state district court denied post-conviction relief in two separate orders, filed December 12, 2013, and December 23, 2013. *Id.* at 3, 16. The OCCA affirmed the denial of post-conviction relief by unpublished order issued February 21, 2014. Dkt. 11-5, *Breckenridge v. State*, No. PC-2014-0030 (Okla. Crim. App. 2014) (unpublished), at 1-2.

Petitioner filed the instant habeas petition (Dkt. 3) on February 17, 2015. He seeks habeas relief the following grounds:

Ground 1:     The identification of [Petitioner] by Larry Ryan should have been suppressed.

Ground 2:     The evidence was not sufficiently corroborated to support the convictions because the eyewitness testimony is suspect.

Ground 3:     The trial judge erred by admitting the preliminary hearing transcripts into evidence at trial.

Ground 4:     The trial court erred by not redacting from the preliminary hearing transcript a biased, personal comment made by the preliminary hearing Judge.

Ground 5:     [Petitioner] was deprived of effective assistance of counsel.

Ground 6:     Unfair surprise deprived [Petitioner] of a fair trial.

Ground 7:     Cumulative error deprived [Petitioner] of a fair trial.

Dkt. 3 at 9, 12, 14, 16, 18, 20-21.

Respondent concedes, and the Court finds, that Petitioner timely filed his federal habeas petition, *see* 28 U.S.C. § 2244(d)(1), and exhausted state remedies by presenting these claims to the OCCA in his direct appeal, *see id.* § 2254(b)(1)(A). Dkt. 11 at 2.[4] Respondent asserts, however, that § 2254(d) precludes this Court from granting Petitioner's request for habeas relief. *See* Dkt. 11.

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act (AEDPA) guides this Court's review of Petitioner's habeas claims. *See* 28 U.S.C. § 2254. Under the AEDPA, a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2254(a). However, because the OCCA adjudicated Petitioner's claims on the merits, this Court may not grant habeas relief unless Petitioner demonstrates that the OCCA's adjudication of those claims either (1) "resulted in a decision that was contrary to . . . clearly established Federal law as determined by Supreme Court of the United States," *id.* § 2254(d)(1)[5]; (2) "resulted in a decision that . . . involved an unreasonable application of, clearly established Federal law," *id.*; or (3) "resulted in a decision that was based on an

---

[4] As discussed, Petitioner presented 13 propositions of error to the OCCA through his post-conviction appeal. But, as Respondent points out, Petitioner does not reassert any of those 13 alleged errors in his habeas petition. Instead, Petitioner's seven stated grounds for habeas relief are based on seven of the twelve propositions of error Petitioner presented to the OCCA through his direct appeal.

[5] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *see also House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (explaining that "Supreme Court holdings—the exclusive touchstone for clearly established federal law—must be construed narrowly and consist only of something akin to on-point holdings").

unreasonable determination of the facts" in light of the record presented to the state court, *id.* § 2254(d)(2).

"To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (alterations in original) (quoting *Williams*, 529 U.S. at 405, 406). When the state court's decision "'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 562 U.S. at 413). Significantly, an "unreasonable application of" clearly established federal law under § 2254(d)(1) "must be 'objectively unreasonable,' not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Lockyer*, 538 U.S. at 75-76). Likewise, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The Court must also presume the correctness of the OCCA's factual findings unless Petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In sum, the standards set forth in § 2254 are designed to be "difficult to meet," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and require federal habeas courts to give state-court decisions the "benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Thus, to obtain federal habeas relief a state prisoner ultimately "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

## I.     Admission of Ryan's eyewitness identification (Ground 1)

Petitioner first asserts that "the identification of [Petitioner] by Larry Ryan should have been suppressed." Dkt. 3 at 9.[6] Petitioner argues Ryan's identification was unreliable because Ryan told police "he could not identify the driver because of distance and stuff," and he could not "pick [Petitioner] out of a six man photo line up." *Id.* He also appears to argue the identification was tainted because Ryan saw Petitioner's face on the news and in the newspaper before he testified at the preliminary hearing and at trial.[7] *Id.* at 9-10.[8]

The "admission of evidence in state trials is ordinarily governed by state law, and the reliability of relevant testimony typically falls within the province of the jury to determine." *Perry*

---

[6]     Because Petitioner appears pro se, the Court liberally construes the arguments presented in his habeas petition. *Licon v. Ledezma*, 638 F.3d 1303, 1305-06 (10th Cir. 2011). But the Court will not construct legal arguments or theories on his behalf. *See Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997). That said, because Petitioner reasserts seven of the twelve claims he raised on direct appeal, the Court finds it helpful to consider Petitioner's appellate brief in construing his arguments.

[7]     In a pretrial suppression motion and in his direct appeal brief, Petitioner also argued the identification was tainted because Ryan first identified Petitioner at the preliminary hearing, 51 days after the attempted robbery, and Petitioner was the "only defendant in the room wearing prison-issued orange clothing, sitting at the defense table in hand cuffs." Dkt. 12-10 at 154; Dkt. 11-1 at 18-22. It is not clear whether Petitioner has abandoned this argument by failing to mention it in his habeas petition. However, giving Petitioner the benefit of liberal construction, the Court will address this point in its analysis.

[8]     Petitioner also asserts that Ryan "committed perjury" and that the "DA's office condoned it." Dkt. 3 at 10. Even liberally construed, the Court does not read these undeveloped allegations as sufficient to state a separate habeas claim. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (stating that "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be granted"). Instead, the Court construes these assertions as additional attacks on the reliability of Ryan's eyewitness identification.

*v. New Hampshire*, 565 U.S. 228, 232 (2012).  However, "a due process check on the admission of eyewitness identification" is necessary "when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of the crime."  *Id.*  This due-process check "requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239 (quoting *Neil v. Biggers*, 409 U.S. 188, 201  (1972)).

This case-specific assessment involves a two-part inquiry.  First, the trial court asks whether the eyewitness identification was "procured under unnecessarily suggestive circumstances arranged by law enforcement."  *Id.* at 248.  If, and only if, the answer to that question is yes, the trial court applies the factors set out in *Biggers*[9] and determines whether the identification has sufficient indicia of reliability "[n]otwithstanding the improper procedure."  *Id.* at 238-40; *see also id.* at 241 ("The due process check for reliability . . . comes into play only after the defendant establishes improper police conduct.").  This is so because "[t]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability."  *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977).  If the court determines "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth."  *Perry*, 565 U.S. at 231.

---

[9]    In *Biggers*, the Supreme Court identified five factors to be considered in measuring the reliability of an eyewitness identification: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  409 U.S. at 199-200.

Here, the state-court record demonstrates that on the morning of the attempted robbery, Ryan told police that the driver of the white car was a "black male." Dkt. 12-5 at 227. Ryan was not asked to identify Petitioner from a photo line up. Dkt. 12-4 at 175; Dkt. 12-5 at 227. At the preliminary hearing, Ryan testified that as he held Lewis down at gunpoint, he saw a white car pull up in front of his house. Dkt. 12-1 at 36-37. He saw two people in the car. *Id.* Ryan testified he recognized one person in the car as "a guy named Brian Breckenridge." *Id.* at 37. When asked how he knew that man's name, Ryan testified he saw the name "in the paper after" the robbery. *Id.* Defense counsel moved to strike the answer, and the court advised the prosecutor to ask Ryan to clarify his testimony. *Id.* at 37-38.

Ryan testified that he "glanced over at" the driver of the white car from "the length of a driveway, 30 feet, 25 feet, something like that." *Id.* at 38-39. He testified it "was 6:30 in the morning" and "pretty dark." *Id.* at 39. Ryan described the driver as "a guy with glasses on," and an "older fellah." *Id.* He testified that the information he obtained from the newspaper was "just the name" of the man he had seen driving the car. *Id.* When asked if he could recognize the driver again, Ryan said, "Probably." *Id.* Then, when asked if the driver was in the courtroom, Ryan testified the driver was "[s]itting over there" and "wearing orange." *Id.* at 40. The prosecutor asked that the record reflect Ryan had identified Petitioner as the driver, and defense counsel objected. *Id.* at 40-41. Defense counsel argued Petitioner was the only man in the courtroom wearing orange. *Id.* The court noted the objection but overruled it, reasoning that Ryan's identification of Petitioner could be tested at trial. *Id.* at 41.

On cross-examination, defense counsel elicited testimony that Ryan took "hard blows" to his head before he saw the driver, Ryan observed the driver in the dark as he continued to struggle with

Lewis, and his observation of the driver was brief because the car's passenger got out and began running toward Ryan with a gun. Dkt. 12-1 at 42-46. Ryan testified he saw the driver for "maybe a minute or so" before the passenger ran toward him. *Id.* at 45. Ryan shot at the passenger a couple of times and "shot at the car two or three times." *Id.* at 46-48. Ryan further testified that, on the morning of the robbery, he told police officers that the passenger was "a young black man, tall, real skinny." *Id.* at 47-48. He testified he did not provide a description of the driver to the police and that he was not asked to identify the driver through a photo lineup. *Id.* at 47, 51. On redirect, Ryan testified that his identification of Petitioner as the driver was based on his observations of the driver during the attempted robbery. *Id.* at 53.

Before trial, Petitioner moved to suppress Ryan's in-court identification. Dkt. 12-10 at 153-57; Dkt. 12-2, Tr. Mot. Hr'g (Sept. 1, 2011). Petitioner argued Ryan's first identification of Petitioner as the driver of the white car occurred at the preliminary hearing under "impermissibly suggestive" circumstances. Dkt. 12-2 at 3-5. Petitioner specifically argued he was "the only defendant in the room wearing prison-issued orange clothing" and handcuffs. Dkt. 12-10 at 154. He further argued, under the totality of the circumstances, Ryan's identification was not reliable. *Id.* at 155-56; Dkt. 12-2 at 5, 7-10. At the conclusion of the hearing, the state district court denied the motion. Dkt. 12-10 at 10.

At trial, Ryan also identified Petitioner as the driver of the white car. Dkt. 12-4 at 155-56. Ryan testified he had Lewis in a choke hold in the driveway when he saw "a white car pull[] up." Dkt. 12-4 at 143-45. Ryan saw a young black male come out of the car, pointing a gun at Ryan. *Id.* at 145. Ryan shot at the male twice, and the male ran back to the car. *Id.* at 146. Ryan testified the white car was sitting across the end of his driveway, and he "looked at" Petitioner, saw "the light

off his face," and "started to shoot him [but] hit one of the neighbor's houses across the street." *Id.*

He testified he had about 20-30 seconds to look at Petitioner. *Id.* at 147. He also testified he "got

a good view of" Petitioner from about 21 feet away. *Id.* at 162-63. Ryan also testified that he saw

broadcast news coverage of Petitioner's arrest and saw his name in the newspaper. *Id.* at 167, 175.

He testified when he saw Petitioner on television he thought, "that's the same guy who was in my

driveway." *Id.* at 167.

On cross-examination, Ryan again testified that he shot at the male who came running at him

from the car. *Id.* at 174. He then testified that he took "the gun off of him and was getting ready to

shoot the driver." *Id.* Defense counsel asked, "Let's talk about that shooting the driver. Today is

the first time you've made that statement; is that not right?" *Id.* Ryan replied, "Probably true."

Ryan also testified it was "dark" when he saw Petitioner and that he saw him from about 21 feet

away. *Id.* at 174, 181.

The OCCA rejected Petitioner's challenge to the admission of Ryan's eyewitness

identification. Dkt. 11-3, OCCA Op., at 3. It reasoned that Ryan "consistently identified [Petitioner]

at preliminary hearing and [at] trial and testified in both instances that his identification was based

upon his view of [Petitioner] at the time of the crime and not any suggestive circumstances." *Id.*

The OCCA further reasoned that Ryan's "identification was not tainted by the victim's pre-trial

viewing of [Petitioner] in the media." *Id.* Citing *Perry v. New Hampshire*, 565 U.S. 228 (2012), the

OCCA stated, "[a]s this pre-trial view of [Petitioner] was not arranged by the police or the result of

improper law enforcement activity, no pre-trial screening by the trial court for reliability was

required." *Id.* The OCCA also rejected Petitioner's argument that Ryan's erroneous description of Lieb as black rather than Native American rendered his identification of Petitioner unreliable.[10] *Id.*

Respondent contends Petitioner has not made the requisite showings under § 2254(d) to obtain habeas relief on this claim. Dkt. 11 at 11-18. The Court agrees. As the OCCA reasoned, Petitioner's challenge to the admission of Ryan's eyewitness identification fails at the first step of the "due process check." Neither Ryan's pretrial exposure to media accounts of Petitioner's arrest nor Ryan's pretrial identification of Petitioner at the preliminary hearing were "procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248. Although Petitioner suggests in his petition that Ryan could not identify Petitioner from a "six man photo lineup," Dkt. 3 at 9, the record demonstrates that police never asked Ryan to do so. Dkt. 12-4 at 175; 12-5 at 227. Because Ryan's pretrial identification of Petitioner as the driver of the white car was not the product of "improper police conduct," the trial court did not abuse its discretion by admitting it and "allowing the jury to assess its creditworthiness." *Perry*, 565 U.S. at 245.

Moreover, as Respondent points out, the "Constitutional safeguards" described in *Perry* were in place at Petitioner's trial. *See id.* at 237 (identifying safeguards such as rights to present and confront witnesses and right to counsel). First, defense counsel thoroughly cross-examined Ryan at trial as to his ability to identify Petitioner as the driver of the white car. Dkt. 12-4 at 168-82. As discussed, defense counsel elicited testimony from Ryan that it was "dark," he saw the driver from at least 21 feet away, and he saw him while he continued to struggle with Lewis and faced the passenger running toward him with a gun. *Id.* at 173-84. The jury also heard testimony that Ryan

---

[10]     Ryan initially told police a black male and white male broke into his home. Dkt. 12-4 at 171-72. The record reflects that Lewis is white and Lieb is Native American. Dkt. 12-10 at 85; Dkt. 12-11 at 68.

saw Petitioner on television before Ryan identified him as the driver, initially misidentified Lieb as black rather than Native American, and could not provide a definitive identification of the passenger who ran toward him. *Id.* at 167, 171-72, 176-78, 181. Second, Petitioner presented testimony from an expert witness regarding the fallibility of eyewitness identification with specific testimony highlighting issues in cross-racial identification. *See* Dkt. 12-6, Tr. vol. 5, at 7-31, 47-79. Third, the trial court instructed the jury to "carefully consider" the reliability factors identified in *Biggers* in evaluating eyewitness identification evidence. Dkt. 12-12, O.R. vol. 3, at 67.

Under these circumstances, Petitioner has not shown that the OCCA's decision rejecting his challenge to the admission of Ryan's eyewitness identification was either contrary to or an unreasonable application clearly established federal law. Thus, the Court denies habeas relief on Ground 1.

## II. Sufficiency of the evidence (Ground 2)

Next, Petitioner asserts "the evidence was not sufficiently corroborated to support the convictions because the eyewitness testimony is suspect." Dkt. 3 at 12. Petitioner appears to argue that his convictions rest on Ryan's unreliable eyewitness identification, Lieb's insufficiently corroborated accomplice testimony, and circumstantial evidence. *Id.* at 12-13.

Liberally construed, Petitioner's Ground 2 claim implicates both state and federal law. Under Oklahoma law, "[a] conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." OKLA. STAT. tit. 22, § 742. In his direct appeal, Petitioner argued that, because Ryan's eyewitness identification was improperly admitted at trial, Lieb's testimony was not

13

sufficiently corroborated under state law. *See* Dkt. 11-1 at 23-28. Relying on state law, the OCCA succinctly rejected Petitioner's argument, stating, "as the victim's identification of [Petitioner] was properly admitted, we find it sufficiently corroborated co-defendant Lieb's testimony." Dkt. 11-3 at 3. To the extent Petitioner reasserts his argument that Lieb's testimony was not sufficiently corroborated, he alleges only an error of state law and is not entitled to federal habeas relief. *See Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007) (noting absence of any Supreme Court cases recognizing constitutional right to have accomplice testimony corroborated by other evidence); *Thornburg v. Mullin*, 422 F.3d 1113, 1128-29 (10th Cir. 2005) ("Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights." (quoting *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999)).

However, Petitioner also asserted a due-process claim on direct appeal, and appears to reassert that claim here, Dkt. 11-1 at 29; Dkt. 3 at 12-13. *Jackson v. Virginia*, 443 U.S. 307 (1979), governs Petitioner's due-process challenge to the sufficiency of the evidence. *See Johnson v. Mullin*, 505 F.3d 1128, 1134 (10th Cir. 2007) (identifying *Jackson* as the constitutional standard for reviewing state habeas petitioner's sufficiency-of-the-evidence claim). The OCCA's decision does not reflect that it considered Petitioner's due-process claim. *See* Dkt. 11-3 at 3. Nonetheless, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. Moreover, the fact that the OCCA neither cited nor discussed *Jackson* does not undermine that presumption. *See Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (reiterating that "a state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-

court decision contradicts them'" (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)); *Miller v. Mullin*, 354 F.3d 1288, 1292-93 (10th Cir. 2004) (applying § 2254(d) "notwithstanding the [OCCA's] failure to cite or discuss federal case law"). Thus, to the extent Petitioner reasserts his due-process claim, the question for this Court is whether the OCCA's implicit rejection of that claim was contrary to or an unreasonable application of *Jackson*.

Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*).

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

*Id.* (internal citations omitted) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).

In applying the *Jackson* standard this Court looks to state law to determine the substantive elements of the crime. *Johnson*, 566 U.S. at 655. "[B]ut the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Id.*

Here, the jury convicted Petitioner of (1) attempted robbery with a firearm, in violation of OKLA. STAT. tit. 21, § 801 (2001 Supp.); (2) first degree burglary, in violation of OKLA STAT. tit. 21, § 1431; (3) assault and battery with a dangerous weapon, in violation of OKLA STAT. tit. 21, § 645 (2006 Supp.); and possession of a firearm after former conviction of a felony, in violation of OKLA.

STAT. tit. 21, § 1283 (2009 Supp.). Dkt. 11-3, OCCA Op., at 1. Petitioner was convicted of the first

three offenses on a theory of aiding and abetting. *See* Dkt. 11 at 20 & n.8; *see also* Dkt. 12-12 at 57-

58 (aiding and abetting jury instructions). Thus, in addition to proving every essential element of

those crimes, the State had to prove that Petitioner "procured the crime[s] to be done, or aided,

abetted, advised or encouraged the commission of the crime[s]." *Glossip v. State*, 157 P.3d 143, 151

(Okla. Crim. App. 2007).

Viewed in the light most favorable to the State, the evidence establishes that Lewis and Lieb

were playing a video game at Ashley Jones's apartment around 2:30 or 3:30 a.m. when Petitioner

arrived. Dkt. 12-5 at 126-28. Jones testified she knew Petitioner as "BB." *Id.* at 128. Lieb testified

Petitioner asked him and Lewis to commit a robbery, provided both men with guns, and advised

them to demand money from a homeowner at gunpoint. *Id.* at 162-70. Petitioner further advised

Lieb and Lewis that if the homeowner failed to comply, they should "tie him up then take what he's

got." *Id.* at 162-63. All three men left Jones's apartment in a white, four-door car. *Id.* at 163-64.

Petitioner drove around for a couple of hours and, at some point, picked up a fourth man. *Id.* at 164-

66, 175-76.

Lieb testified Petitioner drove past Ryan's house, signaled that was the target house, then

dropped Lewis and Lieb off around the corner. *Id.* at 167-68. Lieb and Lewis kicked in Ryan's door,

entered his home without his permission, demanded money from him at gunpoint, and pistol-

whipped him when he refused to comply. *Id.* at 168-70; Dkt. 12-4 at 133-42, 164. Ryan testified

he saw Lewis drop a black gym bag near the love seat when he entered Ryan's home. Dkt. 12-4 at

139, 146. He also testified that, as he held Lewis down in the driveway, he saw a white, four-door

car with two people inside stop at the end of his driveway. *Id.* at 145-47. Ryan shot at the passenger,

who got out of the car, and shot at the car. *Id.* Ryan and Lieb both identified Petitioner as the driver of the car. *Id.* at 155-56; Dkt. 12-5 at 164. When Petitioner drove off, Ryan heard Lewis say, "I shouldn't have taken this job for BB. I shouldn't have done this job for BB." Dkt. 12-4 at 148, 151-53.

The State admitted into evidence several photos of the injuries Ryan sustained during the attempted robbery, and photos of the white car. *See* Dkt. 12-8, State's Tr. Exhibits Nos. 12-19, 52-53. Two of Ryan's neighbors testified they heard gunshots and saw a white car driving away from Ryan's house. Dkt. 12-4 at 195-97, 207-10. During their investigation, police officers observed that Ryan's door had been kicked in, found a black gym bag filled with zip ties near Ryan's love seat, found Lewis's gun and knit cap in Ryan's yard, recovered several spent shell casings from Ryan's yard, and located bullet holes in two houses across the street from Ryan's house. Dkt. 12-4 at 228-31, 239-42, 251-53; Dkt. 12-5 at 34, 47-61.

Petitioner was arrested on October 7, 2010, at the home of his ex-wife, Tiffany Breckenridge. Dkt. 12-5 at 203; 12-6 at 57-59. During the arrest, officers saw a white, four-door Dodge Intrepid parked outside. Dkt. 12-5 at 203. Tiffany identified the car as belonging to the Breckenridge's daughter. Dkt. 12-6 at 57-59. Tiffany also testified that people sometimes refer to Petitioner as "BB." *Id.* at 68.

On these facts, any rational jury could have convicted Petitioner of attempted robbery with a firearm, first degree burglary, and assault and battery with a dangerous weapon under a theory of aiding and abetting. *See* OKLA. STAT. tit. 21, §§ 645 (2006 Supp.), 801 (2001 Supp.), 1431; *Glossip*, 157 P.3d at 151. Further, based on this evidence plus evidence establishing Petitioner's 1993 felony conviction, any rational jury could have convicted Petitioner of possessing a firearm

after former conviction of a felony. *See* OKLA. STAT. Tit. 21, § 1283 (2009 Supp.). Because the jury's findings are fully supported by the evidence presented at trial, Petitioner's *Jackson* claim fails. *See Johnson*, 566 U.S. at 656 ("[T]he only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality."); *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (noting that *Jackson* standard "requires [reviewing court] to accept the jury's resolution of the evidence as long as it is within the bounds of reason"). Thus, the Court denies relief on Ground 2.

### III.    Admission of Lieb's preliminary hearing testimony (Ground 3)

In Ground 3, Petitioner challenges the trial court's decision to admit Lieb's preliminary hearing testimony at trial. Dkt. 3 at 14. He argues the trial court violated his rights under the Confrontation Clause of the Sixth Amendment by finding Lieb unavailable and by allowing the State to read Lieb's preliminary hearing testimony to the jury. *Id.*

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. To protect a defendant's constitutional confrontation rights, testimonial hearsay is inadmissable unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

On the day Lieb was scheduled to testify as a witness for the State, Lieb invoked his Fifth Amendment privilege and refused to testify. Dkt. 12-5 at 4-5. Following a hearing outside the jury's presence, the trial court declared Lieb to be an unavailable witness. *Id.* at 4-16. The court then allowed the State to read Lieb's preliminary hearing testimony into the record at trial. *Id.* at 159-81.

On direct appeal, Petitioner did not challenge the trial court's determination that Lieb was unavailable. *See* Dkt. 11-1, Pet'r App. Brief, at 30 ("Clearly, Lieb had the right to remain silent, and, because he chose to do so, he became an unavailable witness."). Instead, he argued his cross-examination of Lieb at the preliminary hearing was not adequate to preserve his confrontation rights because (1) the scope of a preliminary hearing is more limited than the scope of a trial and (2) the preliminary hearing transcript reflects there were "distractions at [the] preliminary hearing, which included a lot of noise." *Id.* at 31-33.

The OCCA rejected Petitioner's argument. First, it accepted Petitioner's concession that Lieb's invocation of his Fifth Amendment right against self-incrimination rendered him unavailable. Dkt. 11-3, OCCA Op., at 4. Second, it reasoned that because Lieb's "preliminary hearing testimony was given under circumstances closely approximating those of a typical trial, and as he was fully cross-examined by defense counsel, the trial court did not abuse its discretion in admitting into evidence co-defendant Lieb's preliminary hearing testimony." *Id.* In rejecting Petitioner's confrontation clause challenge, the OCCA cited *Thompson v. State*, 169 P.3d 1198, 1205 (Okla. Crim. App. 2007). *Id.*

In *Thompson*, the OCCA stated, "[t]he use of preliminary hearing testimony in a criminal trial is the kind of 'testimonial hearsay' that *Crawford* recognized as being subject to two fundamental Sixth Amendment requirements: (1) the witness must be unavailable, and (2) the defendant must have had a prior opportunity to cross examine the witness." *Thompson*, 169 P.3d at 1205. *Thompson* described three circumstances "closely approximating those of a typical trial" which tend to show that a prior cross-examination was adequate: "(1) the testimony 'was made under oath in a truth-inducing courtroom atmosphere'; (2) the defendant was represented by counsel; and (3)

defense counsel had 'ample opportunity to cross examine' the witness." *Id.* at 1206 (quoting *Howell v. State*, 882 P.2d 1086, 1091 (Okla. Crim. App. 1994)). *Thompson* also acknowledged the possibility "that restrictively limiting defense counsel's cross examination of a witness at a preliminary hearing could make admission of that witness's transcribed testimony at trial . . . a violation of the defendant's constitutional right to confront the witnesses against him." *Id.*

As the OCCA found, all three circumstances *Thompson* described as "approximating those of a typical trial" were present in this case. Dkt. 11-3, OCCA Op., at 4. Petitioner cross-examined Lieb under oath at the preliminary hearing, he did so while represented by counsel, and counsel had "ample" opportunity to cross-examine Lieb. *See* Dkt. 12-1, Tr. P. Hr'g, at 19-23 (cross-examination); *Id.* at 27 (recross-examination). Significantly, defense counsel elicited testimony from Lieb that he anticipated a deal from the State in exchange for his testimony, that he would "say whatever is necessary" to avoid a harsh prison sentence, and that he initially lied to the police about his involvement in the attempted robbery. *Id.* at 19-21, 23. Other than noise "distractions" Petitioner does not identify, either in his direct appeal brief or his habeas petition, any specific limitations at the preliminary hearing that restricted his ability to cross-examine Lieb. Dkt. 3 at 14; Dkt. 11-1 at 30-33. And his ability to elicit testimony damaging to Lieb's credibility demonstrates that Petitioner not only had, but effectively exercised, his opportunity to cross-examine Lieb. That is all that the Sixth Amendment, as interpreted in *Crawford*, requires.

For these reasons, Petitioner fails to demonstrate that the OCCA's adjudication of his claim resulted in a decision that was either contrary to or an unreasonable application of *Crawford*. Thus, the Court denies habeas relief on Ground 3.

**IV.    Admission of preliminary hearing judge's "prejudicial" remark**

Next, in Ground 4, Petitioner claims the trial court violated his constitutional right to a fair trial by failing to redact from the preliminary hearing transcript an allegedly prejudicial comment made by the preliminary hearing judge.  Dkt. 3 at 16.

Respondent contends Petitioner's Ground 4 claim alleges a state-law error rather than a cognizable habeas claim.  Dkt. 11 at 29-31; *see Thornburg*, 422 F.3d at 1128-29 (noting that federal habeas review concerns alleged constitutional violations, not state evidentiary errors).  Alternatively, Respondent argues even if Petitioner alleges a due-process claim, he is not entitled to habeas relief. Dkt. 11 at 31.

Due process does not require a perfect trial, only a fair one.  *Lutwak v. United States*, 344 U.S. 604, 619 (1953); *see also Bruton v. United States*, 391 U.S. 123, 135 (1968) (recognizing that "instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently"). Generally, "opinions formed by the judge on the basis of . . . events occuring in the course of . . . prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).  Consequently, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  *Id.*; *see also United States v. Conway*, 53 F. App'x 872, 878 (10th Cir. 2002) (unpublished) (noting that "however unpleasant, occasional judicial shortness with an attorney, even in the presence of the jury, does not warrant a new trial").[11]

---

[11]    The Court cites *Conway* for its persuasive value.  *See* FED. R. APP. P. 32.1(a); 10th Cir. R. 32.1(A).

Here, during the preliminary hearing, defense counsel elicited testimony from Lieb that he was facing a prison sentence of at least 25 years, he anticipated a deal from the State in exchange for his testimony, and he would "say whatever is necessary." Dkt. 12-1 at 19-21. Defense counsel also elicited testimony that Lieb initially lied to police by telling them he knew nothing about the robbery, and that his "story changed" in anticipation of a deal from the State. *Id.* at 23. On redirect, Lieb testified he initially lied to police because he was "scared." *Id.* at 24. As the prosecutor attempted to elicit testimony about whether his deal would be in exchange for truthful information, the following colloquy occurred:

Q. So, when you talked to me, did I tell you what to say or did you tell me?

A. I told you.

Q. And when I told - - what did I tell you that it was important for you to say?

A. Whatever I told you.

Q. Okay. And what was that supposed to be?

A. Whatever I told you that day.

Q. Okay. Are you supposed to say the truth?

A. I'm supposed to tell - -

[Defense counsel]: Objection, Your Honor, leading.

THE COURT: *No, I think that's valid redirect after your scathing cross.*

*Id.* at 24-25 (emphasis added). The prosecutor ultimately elicited testimony from Lieb that he was, in fact, asked to provide truthful testimony. *Id.* at 25. As discussed in Ground 3, Lieb refused to testify at trial, the trial court declared him an unavailable witness, and the trial court allowed the

State to read Lieb's preliminary hearing testimony—including the italicized remark from the preliminary hearing judge—into the record at trial.

Petitioner argues, as he did on direct appeal, that he was deprived of a fair trial because the jury heard the preliminary judge's "prejudicial" remark about defense counsel's cross-examination. Dkt. 3 at 16. He asserts, "[t]he comment was the Judge's personal opinion of the cross-examination conducted by the defense," and "did not reflect a fair and unbiased judge." *Id.* The OCCA rejected this argument on plain error review; it found "the judge's isolated comment did not indicate any bias and was not unfairly prejudicial." Dkt. 11-3 at 4-5. Thus, the OCCA concluded, the trial court did not abuse its discretion in failing to redact the statement from the preliminary hearing transcript read at trial." *Id.*

Respondent points out that the Tenth Circuit Court of Appeals "has observed that 'Oklahoma's plain-error test is rooted in due process.'" Dkt. 11 at 31 (quoting *Thornburg*, 422 F.3d at 1124). Thus, Respondent argues, to the extent Petitioner alleges a due process violation based on the admission of this remark, this Court must defer to the OCCA's ruling unless it unreasonably applied the plain-error test. *Id.*; *see Thornburg*, 422 F.3d at 1125 (noting that the OCCA reviewed for plain error and stating, "[b]ecause the OCCA applied the same test we apply to determine whether there has been a due process violation, we must defer to its ruling unless it unreasonably appl[ied] [the plain-error] test").

On the record presented, the Court not only defers to, but also agrees with the OCCA's decision that the preliminary hearing judge's isolated remark was not so prejudicial as to deprive Petitioner of due process. Thus, the Court denies habeas relief on Ground 4.

## V. Ineffective assistance of trial counsel

Next, in Ground 5, Petitioner alleges trial counsel provided constitutionally ineffective assistance by (1) failing to challenge the transactional nature of the two prior felony convictions introduced during the third phase of his trial, (2) making prejudicial remarks during voir dire, and (3) misstating the burden of proof during closing argument. *See* Dkt. 3 at 18; Dkt. 11-1 at 38-41.

A criminal defendant has a Sixth Amendment right to the effective assistance of counsel. U.S. Const. amend VI. To establish a deprivation of this right, a defendant must show (1) that counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Petitioner asserts defense counsel's performance was deficient in three aspects. First, during voir dire, defense counsel asked the group of potential jurors a series of questions about race that Petitioner contends "[i]mproperly cast[] aspersions on the defense." Dkt. 11-1 at 40. Specifically, defense counsel inquired, "By a show of hands, who here believes -- who here believes that there are more crimes committed by the black race in the United States than any other race? Raise your hand if you believe that?" Dkt. 12-4 at 89. Defense counsel then stated, "Raise your hand if you believe that there is any one racial group that's responsible for committing most crimes in American [sic]? Raise your hand if you believe that." *Id.* Finally, counsel asked, "There anyone here that's ever had an unfortunate experience with a black person? I have. No one?" *Id.* On the last question, one juror responded that he had unfortunate experiences with many people. *Id.* Counsel then followed up by asking that juror "Do you think your unfortunate experience with a black person or many different people would in some way cloud your judgment in this case?" *Id.* at 90.

Second, during closing argument, defense counsel informed the jury, in part, "Your job will be to determine whether or not the state has proven beyond a reasonable doubt that [Petitioner] was involved in these crimes. Not to determine whether or not he's innocent. Not to determine whether or not you're fairly certain or you believe maybe." Petitioner argues this statement impermissibly lessened the State's burden of proof. Dkt. 11-1 at 40-41.

Third, during the sentencing phase of Petitioner's jury trial, the State introduced evidence that Petitioner had two prior felony convictions in Tulsa County District Court Case No. CF-05-1997, for offenses that occurred on May 2, 2005. Dkt. 12-7 at 104-05; Dkt. 12-8, State's Exhibits 55 and 56. Petitioner argues defense counsel should have challenged his prior convictions because, under OKLA. STAT. tit. 21, § 51.1(B), "[f]elony offenses relied upon [for an enhanced sentence] shall not have arisen out of the same transaction or occurrence or series of events closely related in time and location." *See* Dkt. 11-1 at 39.

Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the OCCA rejected Petitioner's ineffective-assistance-of-counsel claim. First, the OCCA seemingly assumed that trial counsel performed deficiently by failing to challenge the transactional nature of Petitioner's two prior felony convictions. Dkt. 11-3, OCCA Op., at 6. But it found no prejudice. *Id.* Specifically, the OCCA reasoned that even if (1) trial counsel had objected to the use of State's Exhibits 55 and 56 to establish two separate felony convictions and (2) even if the trial court had "thrown out" one of those convictions, "there were still two valid prior convictions which could be used for enhancement" and the "range of punishment was the same whether the jury had for its consideration two priors or three priors." *Id.* Thus, the OCCA found, Petitioner could not show prejudice because "nothing counsel could have challenged would have changed the outcome of the sentencing stage." *Id.* Second, the

OCCA found that defense counsel's comments (1) during voir dire and (2) during closing arguments did not support a finding that counsel performed deficiently. *Id.* at 6-7. As to the voir dire comments, the OCCA reasoned that, read in context, "counsel's comments were designed to weed out potential jurors who had racial prejudices," not to "cast[] aspersions on [Petitioner]. *Id.* As to counsel's closing remarks, the OCCA found that "counsel's challenged comments . . . did not lessen the burden of proof, but were a correct statement of the law and not grounds for a finding of ineffectiveness." *Id.* at 7.

Because the OCCA correctly identified *Strickland* as the clearly established federal law governing Petitioner's claim, the sole question for this Court is whether the OCCA unreasonably applied *Strickland*. *See Richter*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard."). Thus, to obtain habeas relief on his Ground 5 claim, Petitioner must show that the OCCA's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Respondent contends Petitioner cannot make that showing. Dkt. 11 at 35-40. The Court agrees. Under § 2254(d)(1), this Court's review of whether the OCCA unreasonably applied *Strickland* is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Pinholster*, 563 U.S. at 190 (noting that federal habeas court must take "highly deferential" look at counsel's performance under *Strickland* through "deferential lens of § 2254(d)" (quoting *Mirzayance*, 556 U.S. at 123 n.2, 124)). The Court finds nothing unreasonable about the OCCA's determination that Petitioner failed to show prejudice as to counsel's failure to object to the prior

convictions used to enhance his sentences. Likewise, having reviewed counsel's challenged comments in context, the Court finds nothing unreasonable about the OCCA's determination that these comments do not support a finding of deficient performance. Thus, the Court denies habeas relief on Ground 5.

## VI. Unfair surprise

Petitioner asserts in Ground 6 that "unfair surprise deprived [him] of a fair trial." Dkt. 3 at 20. Based on the argument he presented to the OCCA, Petitioner appears to challenge the trial court's admission of Ryan's testimony that he shot at the Petitioner before Petitioner drove away in the white car. Dkt. 11-1 at 47-48.

Respondent contends this claim alleges only a violation of state evidentiary rules, not a cognizable habeas claim. Dkt. 11 at 40-41; *see Thornburg*, 422 F.3d at 1128-29 (noting habeas review is reserved for alleged constitutional errors). Alternatively, Respondent argues that because the OCCA rejected this argument on plain-error review, this Court must defer to the OCCA's ruling unless the OCCA unreasonably applied the plain-error test. Dkt. 11 at 42; *see Thornburg*, 422 F.3d at 1124-25.

To the extent Petitioner's Ground 6 claim could be construed as alleging a due-process violation based on the admission of Ryan's "surprise" testimony, the question on habeas review "is whether the admission of [the challenged evidence] rendered the proceeding fundamentally unfair." *Thornburg*, 422 F.3d at 1129. And, as Respondent points out, AEDPA deference requires this Court to defer to the OCCA's decision unless its application of the plain-error test was "objectively unreasonable. *See id.* at 1124-25.

As previously discussed, Ryan testified at trial that after he saw "a white car pull[] up," a young black man got out of the passenger side and ran toward him with a gun. Dkt. 12-4 at 143-45. Ryan testified he shot at the man twice and, as the man ran back to the car, Ryan "looked at" Petitioner and "started to shoot him [but] hit one of the neighbor's houses across the street." *Id.* at 146. On cross-examination, Ryan again testified that he shot at the man who came running at him from the car. *Id.* at 174. He then testified that he took "the gun off of him and was getting ready to shoot the driver." *Id.* Defense counsel asked, "Let's talk about that shooting the driver. Today is the first time you've made that statement; is that not right?" *Id.* Ryan replied, "Probably true."

On direct appeal, Petitioner alleged that Ryan's testimony that he shot at the driver was presented for the first time at trial. Dkt. 11-1 at 47-48. Relying on state law, he argued this testimony should have been excluded because, even if relevant, its "probative value" was "outweighed by the danger of unfair surprise." *Id.* Applying plain error review, the OCCA found no error and rejected this argument. It found Ryan "testified that it was 'probably true' that he testified for the first time at trial that he shot at [Petitioner] while [Petitioner] sat in the white car." Dkt. 11-3, OCCA Op., at 8. The OCCA reasoned that "any surprise this testimony may have engendered was not harmful as the victim's identification of [Petitioner] was consistent at both preliminary hearing and at trial" and that Ryan's "identification was not based on the fact that he shot at [Petitioner], but that he saw [Petitioner] sitting in the driver's seat of the white car." *Id.* Thus, the OCCA concluded, "the victim's testimony was relevant and relevance was not outweighed by the danger of unfair prejudice." *Id.* The OCCA also noted that defense counsel pointed out on cross-examination that Ryan "had not previously so testified." *Id.*

The Court finds nothing unreasonable about the OCCA's rejection of this claim. As the OCCA found, Ryan agreed with defense counsel that he "probably" made his statement about shooting at Petitioner for the first time when he testified at trial. Based on that finding, the OCCA reasoned that even if Ryan's testimony surprised Petitioner, defense counsel mitigated the effect of that surprise by eliciting testimony from Ryan that he had not previously disclosed this information to police. Under these facts, the Court finds the OCCA's ruling objectively reasonable. Because the admission of Ryan's testimony on this point did not deprive Petitioner of his fundamental right to a fair trial, the Court denies habeas relief on Ground 6.

## VII. Cumulative error

Finally, in Ground 7, Petitioner asserts, as he did on direct appeal, that the cumulative effect of trial errors deprived him of his fundamental right to a fair trial. Dkt. 3 at 21. The OCCA found no errors to accumulate and rejected this claim. Dkt. 11-3 at 9-10.

Respondent argues Petitioner is not entitled to habeas relief on this claim because "there is no clearly established federal law, 'as determined by the Supreme Court of the United States,' controlling this particular claim." Dkt. 11 at 44 & n.15. Notably, the Tenth Circuit has recognized the existence of a circuit split as to "whether the need to conduct a cumulative-error analysis is clearly established federal law under § 2254(d)(1)." *Cole v. Trammell*, 755 F.3d 1142, 1177 n.14 (10th Cir. 2014) (quoting *Hooks v. Workman*, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012)). But, as Respondent acknowledges, *see* Dkt. 11 at 44, the Tenth Circuit nonetheless treats the cumulative-error doctrine as clearly established federal law for purposes of habeas review. *See Cole*, 755 F.3d at 1177 n.14; *Darks v. Mullin*, 327 F.3d 1001, 1017-18 (10th Cir. 2003).

"[I]n the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Alverson v. Workman*, 595 F.3d 1142, 1162 (10th Cir. 2010) (internal quotation marks and brackets omitted). However, a cumulative-error analysis is warranted "only if there are at least two errors." *Lott v. Trammell*, 705 F.3d 1167, 1223 (10th Cir. 2013) (quoting *Hooks*, 689 F.3d at 1194-95). Like the OCCA, the Court finds none. Thus, the Court denies habeas relief on Ground 7.

## CONCLUSION

Based on the foregoing analysis, the Court concludes that Petitioner has not established he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). Therefore, the Court denies his petition for writ of habeas corpus.

### Certificate of Appealability

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A district court may issue a certificate of appealability (COA) "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the district court denies a habeas petition by rejecting the merits of petitioner's constitutional claims, the petitioner must make this showing by "demonstrat[ing] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, if the district court denies the habeas petition on procedural grounds, the petitioner must make this showing by demonstrating both "[1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial

of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

For the reasons stated in the analysis section of this Opinion, the Court concludes that Petitioner has not made the requisite showings to obtain a certificate of appealability. Thus, the Court denies a certificate of appealability as to all claims.

**ACCORDINGLY, IT IS HEREBY ORDERED that:**

1. The Clerk of Court shall note the substitution of Jimmy Martin, Warden, in place of Tracy McCollum, Warden, as party respondent. The Clerk shall also update the record to reflect Petitioner's current place of incarceration as North Fork Correctional Center, Sayre, Oklahoma.

2. The petition for a writ of habeas corpus (Dkt. 3) is **denied**.

3. A certificate of appealability is **denied**.

4. A separate Judgment shall be entered in this case.

**DATED** this 26th day of March 2018.

GREGORY K. FRIZZELL, CHIEF JUDGE